THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 11 |
| AUTO MONEY NORTH, LLC, | ) | |
| | ) | Case No. 22-03309 |
| Debtor, | ) | |
| | ) | |

---

| | | |
|---|---|---|
| AUTO MONEY NORTH, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proc. No. 22-80046 - hb |
| | ) | |
| TRAVIS ABERNATHY, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION
TO THE DEBTOR'S MOTION FOR AN ORDER DECLARING THAT THE
AUTOMATIC STAY APPLIES TO CERTAIN ACTIONS AGAINST A NON-DEBTOR
OR PRELIMINARILY ENJOINING SUCH ACTIONS**

NOW COME Defendants, through their counsel, and respectfully submit this Response in opposition to the Debtor's Motion For An Order Declaring That The Automatic Stay Applies To Certain Actions Against A Non-Debtor Or Preliminarily Enjoining Such Actions. (ECF No. 2) For the reasons stated herein, the Court should deny the Debtor's motions.

**STATEMENT OF DEFENDANTS' CASES AND THE RECENT DECISIONS OF THE
NORTH CAROLINA COURT OF APPEALS**

Defendants are all North Carolina residents. The Debtor - and the non-Debtor AutoMoney, Inc. it seeks to protect - are predatory car title loan lenders existing under the laws of South Carolina. A "car title loan" is a short term loan product that is secured by the title to the

1

borrower's motor vehicle. Some car title lenders charge extremely high annual rates of interest that greatly exceed the interest rates allowed under North Carolina law. The Debtor and AutoMoney, Inc. routinely charge North Carolina residents annual rates of interest in excess of 150% on car title loans. For example, in the case of Defendant Wallace, AutoMoney, Inc. charged her an annual rate of interest of 198.963%. North Carolina law allows a maximum APR of 30.0%. N.C.G.S. §53-176(a).

Prior to the date of the Debtor's Petition, Defendants brought suit in North Carolina against the Debtor and AutoMoney, Inc. for violations of North Carolina lending laws. Specifically, Defendants have made claims for violations of the North Carolina Consumer Finance Act which, at N.C. Gen. Stat. § 53-190, applies to "Loans made elsewhere" and provides:

> (a) No loan contract made outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State. Provided, the foregoing shall not apply to loan contracts in which all contractual activities, including solicitation, discussion, negotiation, offer, acceptance, signing of documents, and delivery and receipt of funds, occur entirely outside North Carolina.
>
> (b) If any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of fifteen thousand dollars ($15,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article.

The remedy for a violation of the Act is set forth in N.C.G.S. § 53-166(d), which states that loans that violate the Act "shall be void and the licensee or any other party in violation shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan."

In their civil actions, the Defendants have alleged that the Debtor and AutoMoney, Inc.

2

discussed their loans over the telephone with them, solicited them for loans over the telephone and by mailings into the state of North Carolina, offered them loans over the phone, used the NCDMV to perfect security interests in their North Carolina titled motor vehicles, collected loan payments from North Carolina, engaged in collection activities in North Carolina, and repossessed motor vehicles in North Carolina. The evidence also establishes that the Debtor and AutoMoney, Inc. offer to pay referral fees to North Carolina residents in an effort to obtain new North Carolina borrowers. Indeed, the Debtor recently sought the permission of the Court to continue doing that.

With regard to the seven cases in which Defendants June Barbour, Teria Bouknight, Corey Davis, Asbury Forte, III, Gloria Gilliam, Aretha Hayes, Joshua Hundley, Donquis Jones, Diane Kirkpartick, Jennifer Leake, Poonam Patel, Mario Robinson, Emmanuel Smith, Lakisha Smith, Patricia Smith, Timothy Smith, Becky Troublefield, Michael Waddell, Doris Wall, Martha Wallace and Brenda Warley are the plaintiffs, they only sued AutoMoney, Inc. The Debtor is not a party to their cases. AutoMoney, Inc. moved to dismiss all seven cases for lack of personal jurisdiction, for a failure to state a claim based on a South Carolina choice-of-law provision, and for improper venue based upon a South Carolina forum selection clause. Those same issues, including a dormant Commerce Clause defense, are the subjects of the Debtor's second adversarial proceeding, Case No. 22-80047-hb. All of the North Carolina Superior Court Judges who heard those cases denied AutoMoney Inc.'s motions to dismiss because the record evidence[1] in those cases shows AutoMoney, Inc. engages in loan making activities in North Carolina that trigger application of the Consumer Finance Act, Chapter 75, and the Usury Statute. AutoMoney, Inc. appealed the trial courts' denials of its Rule 12(b)(2) motion to dismiss

---

[1] Those Defendants' Affidavits are attached hereto collectively as Exhibit 1.

to the North Carolina Court of Appeals as a matter of right and, by way of a Petition for Writ of Certiorari, it asked the NCCOA to hear the merits of its choice-of-law and forum selection clause defenses. Specifically, AutoMoney, Inc., told the NCCOA:

> Discretionary review is also appropriate here because numerous additional courts and arbitrators are looking for direction from this Court regarding the application of North Carolina law to thousands of loans made outside of North Carolina and containing choice of law provisions calling for the application of South Carolina (or sometimes Virginia) law. AutoMoney, Inc. Petition for Writ of Certiorari in *Troublefield v. AutoMoney, Inc*., p. 9 (No. COA 21-421)(Exhibit 2)

The NCCOA allowed AutoMoney's petition and, on July 19, 2022, the NCCOA in unanimous opinions[2] affirmed the trial courts across the board. Those Defendants' cases have been remanded and the North Carolina trial courts are moving those cases forward over the objections of AutoMoney, Inc.[3] Not satisfied with the answer it had asked the NCCOA to provide, AutoMoney, Inc. filed a Petition for Discretionary Review with the Supreme Court of North Carolina. That Petition remains pending. The Supreme Court has shown zero interest in considering AutoMoney, Inc.'s appeal, much less in overruling the NCCOA. Rather than respecting the North Carolina judicial system and waiting on the Supreme Court to rule on that petition, the Debtor filed its second adversarial proceeding, Case No. 22-80047-hb, in which it asks this Court to adjudicate issues of law that the NCCOA has already ruled upon and which its affiliate AutoMoney, Inc. has asked the Supreme Court of North Carolina to consider.

---

[2] *Warley v. AutoMoney, Inc.* (No. COA 21-249)
*Smith v. AutoMoney, Inc.* (No. COA 21-271)
*Hundley v. AutoMoney, Inc.* (No. COA 21-305)
*Troublefield v. AutoMoney, Inc*. (No. COA 21-421)
*Wall v. AutoMoney, Inc*. (No. COA 21-419)
*Leake v. AutoMoney, Inc*. (No. COA 21-411)
*Wallace v. AutoMoney, Inc*. (No. COA 21-418)

Copies of these Opinions are attached as Exhibit 3.

[3] *See, e.g.,* Order Denying Motion of AutoMoney, Inc. for a stay in *Warley v. AutoMoney, Inc*., Guilford County 20 CVS 5460 (Exhibit 4)

4

With regard to AutoMoney Inc.'s choice of law provision, the NCCOA in *Troublefield v. AutoMoney, Inc.*, No. COA21-421, held:

> By discussing its business and the terms of contracts by phone with North Carolina residents, Defendant discussed and negotiated loans within North Carolina as defined by N.C. Gen Stat. § 53-190. Therefore, we conclude Defendant violated N.C. Gen. Stat §53-190, and in turn, violated a fundamental public policy of North Carolina. As such we hold the choice of law provision within Defendant's loan agreements is void as a matter of public policy and the trial court properly denied Defendant's Rule 12(b)(6) motion. (Op. ¶41)

In *Wall v. AutoMoney, Inc.* (No. COA 21-419), the NCCOA held:

> The NCCFA expressly states the law is to be applied to loans made outside of the state unless all contractual activities occur entirely outside of the state, Indeed, in this case Plaintiffs have made specific allegations - which solely for the purpose of this appeal we treat as true - to show Defendant has conducted contractual activities within the state, rendering the NCCFA applicable. For example, Plaintiffs alleged Defendant solicited, discussed and negotiated the terms of the loan agreements, used the DMV to perfect their security interest, and repossessed cars in North Carolina. (Op. ¶27).

> Despite Defendant's arguments to the contrary seeking to avoid application of the NCCFA, for the purpose of this claim, to enforce the choice-of-law provision at this stage of the proceeding would violate the stated fundamental public policy of North Carolina to broadly construe and apply the NCCFA to cover loan contracts made outside this state. See N.C. Gen Stat. §53-190(a). Thus the trial court did not err by declining to enforce the choice-of-law clause to bar Plaintiff's NCCFA claim.   (Op. ¶28).

With regard to AutoMoney's forum selection clause, the NCCOA in *Troublefield v. AutoMoney, Inc.*, No. COA21-421, held:

> [P]rotecting North Carolina residents from predatory lending is a strong public policy of this State. The enforcement of Defendant's forum selection clause would contravene our State's interest in offering such protection by allowing corporations to circumvent our laws through merely establishing themselves in a different state. Moreover, because we are affirming the trial court's denial of Defendant's motion to dismiss under Rule 12(b)(2) and Rule 12(b)(6), to uphold its forum selection clause would functionally undermine our ruling. Therefore, we conclude Defendant's loan agreement forum selection clause is void as a matter of public policy. (Op. ¶44)

5

In connection with the North Carolina Consumer Finance Act, the NCCOA in *Wall* held:

Therefore, since Defendant - at a minimum - solicited in North Carolina, the NCCFA applies. Moreover, the NCCFA, by its terms, evinces a clear public policy that loans to which it applies should be subject to oversight in North Carolina. Enforcement of the forum selection clause despite the clear application of the NCCA to Plaintiffs' loan contracts would run counter to this policy. Thus, for purpose of Plaintiffs' NCCFA claim, to enforce the forum-selection clause would violate the inherent public policy of North Carolina, as reflected in the NCCFA, to regulate loan contracts made elsewhere if some form of contractual activity took place in North Carolina. Therefore, the forum selection clause is rendered unenforceable as against public policy. (Op. ¶39)

In connection with the Responding Defendants' Chapter 75 claims, the NCCOA in *Wall* held:

Here, for the purpose of the UDTPA claim, enforcement of the forum selection [clause] would defeat the original purpose of the law by requiring aggrieved consumers to bring a cause of action *outside* of this state. Thus, insofar as Plaintiffs have a claim under the UDTPA, to enforce the forum selection clause, would violate the public policy of this state to provide a private cause of action to citizens *within* North Carolina. Therefore, the trial court did not abuse its discretion by refusing to enforce the forum selection clause for the purpose of the UDTPA. (Op. ¶40)(emphasis in the original).

In connection with Defendant's claims pursuant to the Usury Statute, Chapter 24, the NCCOA in *Wall* recognized held:

North Carolina usury law makes clear that '[i]t is the paramount public policy of North Carolina to protect North Carolina resident borrowers' from usurious loans. N.C. Gen. Stat. §24-2.1(g). Therefore, for the purpose of Plaintiffs' usury claim, to enforce the forum-selection clause would violate the stated fundamental public policy of North Carolina to 'protect North Carolina resident borrowers' as it would divest North Carolina of the opportunity to enforce their laws and protect its citizens. Consequently, the forum selection clause is rendered unenforceable as against public policy. (Op. ¶45)

The NCCOA in *Hundley v. AutoMoney, Inc.*, (No. COA 21-305) held:

This Court does not believe that AutoMoney could reasonably and in good faith advertise their car title loan services in North Carolina, enter into a loan agreement with a North Carolina resident, secure that loan with collateral which is registered and located in North Carolina, place a lien on property located in North Carolina through the NCDMV, and enter North Carolina to take possession of the collateral and not expect to be subject to the privileges and protections of North

6

Carolina law merely because the loan paperwork was signed in South Carolina. (Op. ¶23)

Finally, and in connection with AutoMoney, Inc.'s use of the resources of the North Carolina DMV to place liens on North Carolina issued motor vehicle titles, Superior Court Judge Michael A. Stone in *Smith v. AutoMoney, Inc*. (Hoke County, NC: 20 CVS 295) held:

> I think it's the crux of the whole issue. I mean, quite frankly, let's assume AutoMoney doesn't take calls from people out of state, doesn't solicit, they don't do anything but given that their name is a lienholder on the North Carolina certificate of title, if that's all they do, its game over in my opinion - the way I see the law. (Exhibit 5, Transcript of Hearing on AutoMoney Motions to Dismiss)

During the Court's hearing on the Debtor's First Day Motions, the Court expressed concern that the rulings of the NCCOA were not merits-based decisions. With all due respect to the Court, this is not the case. At AutoMoney, Inc.'s request by way of its Writ of Certiorari, the NCCOA reached the merits of AutoMoney, Inc.'s choice-of-law and forums election clause defenses on well-developed records[4] that, through Affidavits, factually established:

- From January 1, 2015 through September 30, 2020 MoneyGram processed approximately 42,000 payments to AutoMoney from North Carolina borrowers in an amount totaling approximately $8,992,308.86.

- From November 1, 2019 through October 31, 2022 MoneyGram processed approximately 2567 payments to AutoMoney from North Carolina borrowers in an amount totaling approximately $713,058.92.

- AutoMoney has filed more than 1000 car title liens with NCDMV each year since 2015.

- Associates Asset Recovery alone has repossessed at least 442 motor

---

[4] An exemplar record, the Record in *Troublefield v. AutoMoney, Inc*. (No. COA 21-421), is a voluminous document that is in excess of 600 pages. Therefore, contemporaneously with the filing of this Response Counsel will deliver a copy of that Record to the Court.

7

vehicles in North Carolina for AutoMoney since January 1, 2016.

- From 2013 to 2019 AutoMoney ran print ads in "Steals and Deals" which is a marketing publication that is widely circulated in North Carolina.

- AutoMoney, on its website, has held itself out as having a business location in Charlotte, North Carolina, as having made "thousands" of loans to North Carolinians and as being the "trusted name in title loans" in North Carolina.

- AutoMoney has set up stores along the North Carolina-South Carolina border for the stated purpose of marketing directly to and attracting North Carolina borrowers.

- AutoMoney engages in substantive telephone discussions regarding the details of its loan products with potential customers in North Carolina.

- AutoMoney calls and solicits potential borrowers in North Carolina.

- AutoMoney accepts online inquiries from North Carolina and then makes sales calls into North Carolina to the persons who submitted their contact information to AutoMoney.

- AutoMoney offers loans over the phone to North Carolinians and it receives acceptances of its loan offers by telephone from North Carolinians.

- AutoMoney provides information about its loans over the phone to North Carolinians and discusses amounts to be borrowed.

- AutoMoney directs North Carolina residents to travel out of state to its stores and it tells North Carolina borrowers what documents to bring to

    take out loans.

- AutoMoney perfects security interests using the North Carolina DMV.

- AutoMoney accepts payments from North Carolina.

- AutoMoney pays borrowers to refer new borrowers from North Carolina in an effort to develop and maintain a network of compensated referral agents in North Carolina.

- AutoMoney sends written solicitations into North Carolina.

- AutoMoney sends collection letters into North Carolina.

- AutoMoney makes collection calls into North Carolina.

- AutoMoney enters into North Carolina to seize motor vehicles.

By its second adversarial proceeding (Case No. 22-80047-hb), Auto Money now seeks a declaration of this Court in its favor on the choice of law and forum selection clause defenses that have already been rejected by the NCCOA. And, in connection with its dormant Commerce Clause defense which AutoMoney, Inc. also raises in its second adversarial proceeding, AutoMoney, Inc. had every opportunity to litigate that issue in the North Carolina courts and elected not to do so. In its Reply Brief in *Troublefield v. AutoMoney, Inc.*, at pp. 17-18, AutoMoney, Inc. told the NCCOA:

> AutoMoney did not present a Commerce Clause argument at the trial court level, and AutoMoney reserves this defense for a later date where it will be fully briefed and argued, and if necessary, this Court (the NCCOA) may still hear this issue. (Reply Brief, Exhibit 6)

AutoMoney, Inc. will have every opportunity again to litigate its constitutional defense in the Courts of North Carolina and, in particular, in the now remanded and proceeding civil

9

actions.[5] Indeed, it has already filed responsive pleadings in the Courts of North Carolina in which it raises a dormant Commerce Clause defense. *See, e.g.*, AutoMoney Inc.'s Amended Answer in *Troublefield v. AutoMoney, Inc.*, Fifth Defense (Exhibit 9).

Despite the clear rulings of the NCCOA the Debtor and AutoMoney, Inc. continue to make loans against North Carolina motor vehicle titles. (Exhibit 10 – Miles Loan Agreement dated July 30, 2022.) They continue to call and solicit North Carolina residents for predatory loans. (Exhibit 11 – Affidavit of Becky Troublefield: " On October 20, 2022, at or about 2:22 p.m., I received a call from 'Chelsea' at the AutoMoney store in Bennettsville, South Carolina." "Chelsea asked me if I would like to take out another loan with AutoMoney." ). They continue to enter North Carolina for collection purposes. (Exhibit 12 - Affidavit of Teresa Hicks: "I got behind on my loan payments and on or about October 21, 2022 an AutoMoney employee who I think is named "Chelsea" showed up at my house in North Carolina to try to collect from me."). They continue to seize and sell North Carolina collateral motor vehicles. (Exhibit 13 - Belin Notice of Repossession and Sale)

Even if the Court were to take the position that all of the North Carolina decisions detailed above were not technically merits-based because the allegations have not been found as fact by a judge or jury, the Debtor and AutoMoney, Inc. are attempting to prevent exactly that from happening through this South Carolina Court Hail Mary; a Hail Mary described by their own counsel at the First Day Motions Hearing as essentially a last resort, seemingly knowing

---

[5] This was recognized by now D.C. Circuit Court Judge J. Michelle Childs in her Order dismissing the Debtor's Declaratory Judgment Complaint on abstention grounds in *Auto Money North, LLC v. Fentress Brown,* No. 0:21-cv-00393-JMC (D.S.C. Feb. 8, 2022)(Exhibit 7)("AutoMoney North has ample opportunity to litigate its claims in any of the thirty-two (32) proceedings against it and Auto Money, Inc. in venues across the state of North Carolina but instead seeks a federal forum." ) *See also AutoMoney, Inc. v. Deirdre Booker Pippins*, No. 2:19-2217-RMG (D.S.C. December 30, 2019)(Exhibit 8) where South Carolina District Court Judge Richard Gergel held: "the pending [North Carolina] Superior Court litigation between the parties affords an ample forum in which the parties can efficiently and effectively litigate all of their claims."

that continuing the North Carolina litigation would not be in their favor. The owners of the Debtor and AutoMoney, Inc., John and Linda Derbyshire, are literally thumbing their noses at the Courts of North Carolina.

## ARGUMENT

### I.     The Debtor Is Using Chapter 11 For An Improper Purpose.

In *In re LTL Management, LLC*, (Case No. 21-30589-JCW, W.D.N.C.), Johnson & Johnson, when faced with over forty thousand (40,000) lawsuits alleging injuries from consumer use of its talc containing products, created an entity called LTL Management LLC (LTL) for the stated purpose of holding, managing and settling talc injury legal claims. It promptly thereafter put LTL into a Chapter 11 bankruptcy in the Western District of North Carolina (Case No. 21-30589-JCW and adversary proceeding No. 21-03032). LTL then moved the court for the relief the Debtor now seeks in this Court: a declaration that the automatic stay applied to actions against non-debtors or a preliminary injunction against such actions. The Court allowed those requests. (Exhibit 14)

Johnson & Johnson relied upon a Texas corporations statute to execute what is known as a "Texas Two Step" to create LTL, attempt to assign its talc liabilities and then place LTL into a Chapter 11. Auto Money, Inc. does not rely on that statute. This maneuver is highly controversial as being a misuse of Chapter 11 and a deprivation of a claimant's right to a jury trial. The case is presently under review at the Third Circuit.

All that said, there are four fundamental differences between what Johnson & Johnson did in *LTL* and what the Derbyshires and AutoMoney, Inc. are attempting to do here:

First, Johnson & Johnson has pulled its talc products from the domestic market. The Debtor and the non-debtor it seeks to protect, AutoMoney, Inc., on the other hand, are continuing

11

to solicit in North Carolina, make loans to North Carolina residents, use the NCDMV to place liens on North Carolina car titles, collect in North Carolina and enter North Carolina to seize motor vehicles.

Second, in its Order allowing LTL's motions, the court specifically found that LTL had filed its Chapter 11 case in good faith with the specific intent to engage in good-faith negotiations with its claimants regarding a plan of reorganization and that LTL had sufficient resources to implement a trust pursuant to Bankruptcy Code Sections 105 and/or 524(g). (Exhibit 14, p. 5)[6] The Debtor here makes no such assurances. In fact, it does the exact opposite. While the Debtor does pay lip service to fair settlements of Defendants' claims (ECF No. 2, ¶ 10: "The Debtor commenced the underlying Chapter 11 case to resolve permanently and equitably all current and future litigation … .")[7] its first move after filing its Petition was to file an adversary proceeding (ECF No. 25) against its borrowers in an attempt to avoid their claims.

Third, J&J placed two billion dollars ($2,000,000,000) in the estate of LTL. The Derbyshires and AutoMoney, Inc. are doing the opposite: the Debtor has accelerated payments on its November 18, 2019 twenty-year $6,744,000.00 note owing AutoMoney, Inc. to pay that debt down to $893,010.33 as of November 30, 2022. (ECF No. 8, Declaration of Jeremy Blackburn, ¶ 12)

Finally, and unlike the Debtor here, LTL did not file any actions seeking to avoid the assigned talc liabilities. (Exhibit 15).

This Court should see the Debtor's bankruptcy filing and adversarial proceedings for

---

[6]  See Exhibit 14, p. 6, M (iii)(b): "In addition, the injunction will ensure that the benefits of a complete and equitable resolution of talc-related claims against the Debtor flow to all claimants."

[7]  See also ECF No. 24, ¶ 86: "The Debtor has entered this case in good faith in an effort to resolve permanently, fully and efficiently the pending and potential North Carolina litigation. The Debtor has sufficient wherewithal to successfully complete the reorganization in this Chapter 11 case, as well as foreseeable access to post-petition financing, if any, as may be required to confirm a plan of reorganization."

what they are: transparent efforts by the Debtor and AutoMoney, Inc. to avoid the clear holdings of the NCCOA discussed, *supra*, to continue with impunity to solicit and engage in loan making in North Carolina in manners that the NCCOA has determined to violate North Carolina law and, *for the third time now*[8] to litigate in a South Carolina federal court questions of law that are properly before and long pending in the Courts of North Carolina. The bankruptcy courts do not exist for this purpose and do not condone the use of Chapter 11 to resolve disputes in the bankruptcy court when litigation is still pending in a non-bankruptcy forum prior to the commencement of the case. *See In re Serfass*, 325 B.R. 901, 905-906 (Bankr. M.D. Fl. 2005) *See also In Re H.B.A. East*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988))("Chapter 11 relief should not be available to entities filing to obtain a perceived advantage in litigation with others or to provide an alternate judicial forum." "The Chapter is entitled reorganization and not litigation."), *In re Muskogee Envtl. Conservation Co.*, 236 B.R. 57, 66-67 (Bankr. N.D. Okla. 1999)("[D]ebtors are not entitled to have the Bankruptcy Court hear their complaints merely because they are disgruntled with the process in State Court.") and *Matter of NW Place, Ltd.*, 73 B.R. 978, 982 (Bankr. N.D. Ga. 1987)("Chapter 11 relief should not be made available to an entity solely to get an upper hand in litigation against another party, nor solely to provide an alternative forum for a debtor." " There is state court litigation pending between the parties and the state court is the appropriate forum for resolution of the dispute.")  The Court should deny the Debtor's Motions.

> **II.     The Court Should Deny the Debtor's Request for A Declaration That The Automatic Stay Extends To Protect AutoMoney, Inc.**

The Debtor bears a burden of showing that sufficient factual and legal grounds exist to support the relief the Debtor seeks. *In re: Thomas Paul Glenn, Jr.*, No. 16-03017-jw (Bankr.

---

[8]     *AutoMoney North, LLC v. Brown* and *AutoMoney, Inc. v. Pippins*, (Exhibits 7 and 8).

13

D.S.C. 2016)  This District has recognized that "unusual circumstances" must exist to warrant an extension of automatic stay.  *Id*.  (citing *In re Newberry Atrium Prof'l Ctr., LLC v. TD Bank, N.A.*, Adv. Pro. No. 13-80028-JW)(Bankr. D.S.C. 2013).  The relief the Debtor seeks has been described by the courts as being "extraordinary." *In re SDNY 19 Mad Park, LLC*, No. 14-11055 (Bankr. S.D.N.Y.  2014). Indeed, the Fourth Circuit has recognized that "something more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 Bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties."  *A.H. Robins Company, Inc. v. Piccinin*,  788 F.2d  994, 999 (4th Cir.  1986).

In making a determination as to whether the automatic stay should extend to non-debtors, the Courts consider five factors:

> 1) whether there is such identity between the debtor and the third party that the debtor may be said to be the real party defendant and that a judgment against the third party will in effect be a judgment against the debtor; 2) the suit against the third party would threaten or interfere with the debtor's reorganization efforts; 3) whether the third party is necessary to the debtor's reorganization efforts; 4) whether the third party is entitled to indemnity from the debtor which would deplete the debtor's assets; and 5) whether a judgment against the non-debtor would be binding or imputed to the debtor by operation of law.

*Id*. at 4-5 (citing *Newberry Atrium*).  The Debtor cannot carry this high burden.

A.      <u>The potential for preclusion is not enough.</u>

The Debtor argues that if Defendants' cases are allowed to proceed those  actions could bind the Debtor through *res judicata*, collateral estoppel and issue preclusion. (ECF No. 2, ¶ 92). However, the mere possibility that the litigation against AutoMoney, Inc. will be in some manner precedential or preclusive is not enough. The Second Circuit in *Queenie, Lt. v. Nygard Int'l*, 321 F. 3d 282 (2d Cir. 2003) recognized:

> We have not located any decision applying the stay to a non-debtor solely because of an apprehended later use against the debtor of offensive collateral estoppel or the precedential effect of an adverse decision. If such apprehension could support

14

> application of the stay, there would be vast and unwarranted interference with creditor's enforcement of their rights against non-debtor co-defendants.

*Id*. at 288.

    B.    <u>Allowing Defendants' actions against AutoMoney, Inc. to continue will not in any way harm or impede the Debtor's reorganization efforts</u>.

In the cases of June Barbour, Teria Bouknight, *et al*. abundant records have already been developed. Dispositive motions have been heard and denied. Appeals have been taken and concluded. Their cases have been remanded and are now ripe for summary dispositions or bench trials with little or no involvement on the part of the Debtor. Allowing cases to proceed to judgment against AutoMoney, Inc. should not, in any measurable way, harm the Debtor's reorganization.

    C.    <u>There is no evidence that AutoMoney, Inc. is necessary to the Debtor's reorganization efforts</u>.

The Debtor does not appear to be dependent on Auto Money, Inc. in its reorganization efforts. Indeed, the Debtor was able to pay down its November 18, 2019 twenty-year $6,744,000.00 note owing AutoMoney, Inc. to $893,010.33 in three years. (ECF No. 8, Declaration of Jeremy Blackburn, ¶ 12) Moreover, the Debtor represents to the Court that "the Debtor has sufficient assets to fund the Chapter 11 case … ." (ECF No. 2, ¶ 104).

    D.    <u>The mere fact that AutoMoney, Inc. may be entitled to indemnity from the Debtor is insufficient to justify extension of the automatic stay</u>.

Courts have held that the fact "that a debtor may have to indemnify a third party is alone not a sufficient basis to extend the automatic stay as to that party because the justification for extending the stay 'must be consistent with the purpose of the stay itself, [which is] to suspend actions that pose a serious threat to a corporate debtor's reorganization efforts.' " *In Re: SDNY 19 Mad Park, LLC* at 4. (citing *In Re: FPSDA 1, LLC*, 2012 WL 6681794 (Bankr. E.D.N.Y 212). And, in *In re Newberry,* this District held:

15

> Additionally, although the Debtor alleged that [the non-debtor] has a right of indemnification from the Debtor for costs incurred in connection with the state court proceeding, it appears from the evidence submitted that [the non-Debtor] has sufficient funds to pay his own defense and would not necessarily need to invoke the alleged indemnification right against the Debtor. Further, importantly, the Debtors' budgets do not indicate a dire need for funding from [the non-debtor] prior to confirmation.

*In Re Newberry*, No. 13—01377-JW, at p. 7. This holding is spot on to the matter before the Court. First, the NCCOA cases cited, *supra*, make it very clear that AutoMoney Inc. has thus far had sufficient resources to vigorously litigate the claims of the Responding Defendants. There is no reason to think those efforts will either cease or lessen or that moving forward AutoMoney, Inc. will lack sufficient resources to continue its defense of the claims of the Defendants. Second, and again, the Debtor does not appear to in distress or financially dependent on AutoMoney, Inc. in its reorganization effort given that it was able to pay down a twenty-year $6,744,000.00 note owing AutoMoney, Inc. to $893,010.33 in three years and represents to the Court that it is financially sound. Moreover, it is unlikely that even in the event AutoMoney, Inc. makes an indemnity claim, that claim would deplete the debtor's assets.

  E. <u>A judgment against AutoMoney, Inc. would not be binding or imputed to the Debtor by operation of law</u>.

A judgment against AutoMoney, Inc. rendered by a Court in North Carolina will not be a judgment against the Debtor. The automatic stay will prevent that.

  **III. The Court Should Deny the Debtor's Request For A Preliminary Injunction.**

Here the Court considers: 1) the debtor's reasonable likelihood of reorganization; 2) the imminent risk of irreparable harm to the debtor's estate without the injunction; 3) the balance of harms between the debtor and its creditors; and 4) whether the public interest weighs in favor of an injunction. *In re Chicora Life Ctr., LC,* 553 B.R. 61, 64 (Bankr. D.S.C. 2016). The Debtor cannot carry this burden either.

    A.    <u>The Debtor has no chance of reorganization if it continues to transact business in North Carolina.</u>

ECF No. 40-1, the Debtor's "Outstanding Check Registers, " indicates that on December 1, 2022, the day before it filed its Petition, the Debtor used the NCDMV to place liens on at least seventeen (17) North Carolina car titles on that day alone. Despite the rulings of the NCCOA, the Debtor clearly has no intention to stop soliciting in North Carolina[9], to stop using the resources of the NCDMV, to stop collecting payments from North Carolina[10] and to stop entering North Carolina to seize motor vehicles. Every time the Debtor makes loans to North Carolina residents it creates for itself more liabilities, many of which will result in post-petition litigation in North Carolina. Given that the Debtor has already represented to the Court that the pending North Carolina litigation is "crippling if not fatal, to the Debtor's business" (ECF No. 24 ¶ 12) and that the North Carolina litigation "threatens the Debtor's business and its ability to reorganize" (ECF No. 2 p. 2), it should be quite difficult for the Court to accept that the Debtor will be able to successfully reorganize unless it changes its business model.

    B.    <u>The Debtor cannot show any imminent risk of irreparable harm to the Debtor's estate</u>.

Here, the Debtor argues that it faces irreparable harm in the form of the potentially preclusive effects of the Defendants' pending cases against AutoMoney, Inc. (DN 2, ¶ 106). Setting aside the fact that *stare decisis* was established on July 19, 2022 when the NCCOA

---

[9]     Exhibit 11 - Affidavit of Becky Troublefield: " On October 20, 2022, at or about 2:22 p.m., I received a call from 'Chelsea' at the AutoMoney store in Bennettsville, South Carolina." "Chelsea asked me if I would like to take out another loan with AutoMoney." ).

[10]     Exhibit 12 - Affidavit of Teresa Hicks: "I got behind on my loan payments and on or about October 21, 2022 an AutoMoney employee who I think is named "Chelsea" showed up at my house in North Carolina to try to collect from me.").

handed down its rulings in the *Wall* and *Troublefield* line of cases, the mere threat of preclusion is not enough. *See Queenie,* discussed *supra*.

    C.    <u>Allowing the Debtor's motion will cause harms to the Defendants that far outweigh any harm to the Debtor.</u>

Most of the Defendants' cases, and in particular the cases of Defendants June Barbour, Teria Bouknight, *et al*., have been pending a very long time. Some of the cases were filed in mid-2019 and have been through lengthy ligation. The claims of the Defendants June Barbour, Teria Bouknight, *et al*. have been subjected to denied motions to dismiss. Their cases have been to the NCCOA, were fully briefed and orally argued. Their cases have been remanded, stay motions denied and the cases are now ripe for well-deserved and long overdue summary disposition or bench trials. The relief the Debtor seeks will cause yet another delay in final adjudications. All Defendants are due their day in Court with AutoMoney, Inc. and will be harmed by any further delays. The Debtor, on the other hand, cannot show any harm. It is not a party to that litigation and, as discussed, its biggest concern (issue preclusion) is unfounded. *Stare decisis* attached long before it filed its Petition. Moreover, AutoMoney, Inc. continues to retain Defendants' principal, interest and fee payments in violation of N.C.G.S. § 53-166(d).

    D.    <u>Public interest weighs against the requested injunction</u>.

While it is certainly true, as the Debtor argues, that the public has in an interest in successful reorganizations, the Court should be more concerned about what the Court should view as an equally important, if not overriding, public interest: the interest of the state of North Carolina in protecting its residents from predatory lending. The North Carolina legislature has declared at N.C.G.S. §24-2.1(a):

> It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.

18

*See also Troublefield* where the NCCOA held: "protecting North Carolina residents from predatory lending is a strong public policy of this State." The relief the Debtor seeks - an injunction against Defendants' continued prosecution of their claims against AutoMoney, Inc. in the Courts of North Carolina - is counter to the sound public policy of North Carolina and will impair and frustrate the intent of the North Carolina legislature to protect its residents from predatory lenders. Indeed, allowing such relief will wrap AutoMoney, Inc. in a cloak of immunity. It will have free rein to continue entering North Carolina to collect on unlawful loans and repossess vehicles. Defendants, on the other hand, will be defenseless.

## CONCLUSION

For the reasons stated herein, Defendants respectfully pray the Court for an Order denying the Debtor's Motions and allowing their cases against AutoMoney, Inc. to proceed.

This is the 22nd day of December, 2022.

> */s/ Andrew H. R. Brown*
> S.C. State Bar No. 102010
> Attorney for Defendants

**FOR THE FIRM:**

BROWN, FAUCHER, PERALDO & BENSON, P.L.L.C.
822 North Elm Street, Suite 200
Greensboro, N.C. 27401
(336) 478-6000 (telephone)
drew@greensborolawcenter.com

*/s/ Joshua Hudson*
Fed. ID No. 11620
Attorney for Defendants

**FOR THE FIRM:**

Smith Hudson Law, LLC
200 N. Main Street, Suite 301
Greenville, SC 20601
864-908-3914
jhudson@smithhudsonlaw.com